privacy litigation. Mr. Barnes? Thank you, Your Honors. Jay Barnes on behalf of the appellants. I'd like to reserve four minutes for rebuttal, Your Honors. May it please the Court. Your Honors, this is a case about Internet privacy. In fact, it's a case about the biggest Internet hacking and tracking scheme in history, a scheme which led to the largest fine in the history of the FTC and the largest multi-state settlement of its kind with State Attorneys General in history. We noticed your new counsel as of this morning. Which firm are you from? From Barnes & Associates in Missouri. From where? Missouri. What firm? Barnes & Associates. I didn't see you on the original video. There was a little mix-up there, Your Honors. My understanding is that I had been interred six weeks ago. That's okay. I was just curious. We're glad you didn't get noticed last night. We don't usually get somebody to jump in a case like this at the last minute. Well, I've been here for a while, Your Honor. What the defendants did in this case was employ sophisticated computer coding schemes to hack their way around the plaintiff's chosen privacy settings on the web browsers they use to send and receive communications on the Internet, in particular Apple Safari and Microsoft Internet Explorer. And by engaging in these hacks, what the defendants were able to do was track, intercept and access the contents of communications that the plaintiffs had just made or were in the process of making with websites on the Internet. And they did this without the consent of the plaintiffs or the knowledge of the plaintiffs, without the consent or knowledge of the websites or of the web browsers. The plaintiffs made nine total claims and we stand by each of them because we have only a limited time here today. We'd like to focus on the Wiretap Act, Intrusion upon Seclusion and Historic Communications Act. Can you address first on standing? Where do you allege that you have incurred any costs or that the PII information has lost value in the marketplace or there's been a lost opportunity to sell? Where do we find that quantifiable loss? Your Honor, that's in paragraph 49, 56 through 66 and paragraph 193. And he asked about standing so I'll skip ahead to intrusion upon seclusion because I think that's where the standing argument is most pressing. Where is that, Mr. Barnes? The intrusion upon seclusion claim. We made a claim for intrusion upon seclusion, common law intrusion upon seclusion and invasion of privacy under the California Constitution. Could you also comment? Judge Robinson, in her opinion, stated that plaintiffs have not alleged injury in fact sufficient to confer Article III standing. That's a very wide, you know, sweeps widely the statement. And that's what I want to get to. First, there's the allegations of economic harm, which I just referenced in those paragraphs. What's referenced there suggests that this information has economic value to the defendants, that there is an innocent market and some holes where people are beginning to put some value on how they would value the protection of this data. But where do you allege that the class members' data actually lost value just because the defendants have a copy of it? Well, Your Honors, they took something that was the property of the plaintiffs and absconded it as their own. And we think an analogous situation could be a misappropriation of trade secrets claim, which we have not made in this case, but for which there are damages from taking information even if there's not a diminution in value to the plaintiff in that type of case. And then there's available damages for a reasonable royalty value. But for intrusion claims, plaintiffs can state the invasion of privacy to assert standing. But we have some statutes where we need to find economic loss. So if you could focus on that, where do we see some concrete loss of opportunity or loss of economic value? Where is there an allegation that any of the class members ever sought to sell their data? When they did, it was valued at less than it would have been otherwise. There's not an allegation for seeking to sell the data by the plaintiffs, Your Honor. But this is information that has a value that was taken from them that diminishes its value in the market. No actual sale? No actual transaction? There's no sale from the plaintiff, no, Your Honor. But for intrusion claims, we have statutory standing if we talk about the elements of those torts. It sounds like you want to focus on the privacy claims rather than those that involve economic loss. Well, I want to focus on the Wiretap Act for which we have statutory standing, intrusion which is the common law claim that's a century old, and then the Stored Communications Act for which we also have statutory standing. All right. On the Wiretap Act, since you want to focus on that, let's go to the Wiretap Act. Thank you, Your Honor. Okay. Now, the Wiretap Act only requires one party consent, correct? Under the federal law, it's... Under the federal law, that's the Wiretap Act. That's right. And under California law, it is all parties to the communication. Let's stick with the federal law for a second. Yes, Your Honor. One party consent. The side argues that at the minimum, there's at least one party consent because the website consent. Well, Your Honor, that turns the well-pleaded facts of the plaintiff's complaint upside down. I think it's in paragraph 125 of the complaint where the plaintiff's, quote, statements from the websites at issue. If you look at the response when this hack was revealed, the websites didn't know it was happening. There's... Safari didn't know it was happening or at least said publicly they didn't know it was happening. They wanted it to stop. Internet Explorer said they wanted it to stop. But if you look at the plaintiff's complaint, the websites did not know either. That's... I'm sorry, it's paragraph 126, Your Honor, with the quotes from the websites. And consent, Your Honor, so is a factual issue. And they have to show that the websites did in fact consent to this when the plaintiff's complaint shows that at least some of these websites did consent to this. And the reason they didn't consent or didn't know is because of the highly secretive nature of how the defendants carried out this hacking scheme and involved an invisible iframe, an invisible form, an invisible submission. You're not referring to the blocker that was on the Safari? That is Safari. It was to work... It was a scheme to work their way around the blocker in the Safari browser. Can you focus for us? What is the this? Don't we need to be clear about what is the community communication we are talking about? Yes, Your Honor. And that comes under the Wiretap Act claim. And that is the question about whether we viatically alleged contents. We alleged contents, the interception of contents in three forms. Detailed URLs, filled in forms on websites on the Internet, and search queries. And under the Wiretap Act, contents is defined as any information relating to the substance, purport, or meaning of an electronic communication. And it protects both the sending and the receiving of communications. So the question is whether those three things contain information relating to the substance, purport, or meaning of any communication. Whether they are being sent by the plaintiff somewhere or being received... But if we find there is one party consent, we don't need to get the content. Well, but there is a fact issue there. That is a big issue for you. There is a fact issue there, Judge. Yes, but you want us to get the content, and I understand why. But if we conclude there content issues becomes irrelevant under the Wiretap Act. There is two issues there. One, it is a fact issue. Two, to the extent it is not a fact issue, we prevailed in the district court and the defendants failed to cross-appeal. And then there is the fact that it turns the complaint upside down, which is the complaint shows that these websites did not consent to this type of activity. I need to go back, please, to what is the type of activity we are talking about. Because if the communication in question is transmission of URLs, for example, can you identify for us what URLs are being transmitted as a result of the cookie that wouldn't otherwise be transmitted? Well, Your Honor, we are talking about a difference in kind here. If there was consent at all from those websites, it was only to the fact that, here, we need an advertisement here. In this case, that is not what happened. It is the difference, I would say, between consent to a picture with robe on from the neck down to consent with a picture with robe off with face revealed. They are completely different items, Your Honor, and this is the difference between the two. Could you help me with the functioning of cookies? What exactly are they doing? I see that there are different portrayals of exactly what they do and how much information they accumulate. In one instance, they function largely as passive and somewhat benign, identifying markers on communications between, in this case, plaintiffs and the defendant's server. In other instances, they behave like spyware, or at least that is the allegation. I get that, histories and so forth. Which of those models or portrayals is the one that you are referring to? This is a case about the non-consensual use of cookies and cookies, in particular, the defendant's cookies that were used to track all of the plaintiff's communications on the Internet without their consent by hacking their way around the privacy settings on these web browsers. Do they all behave the same way? I think that is really what I am trying to get at. Which is the model that you are pursuing? An ordinary cookie, a consensual cookie, does not require a company to put an invisible iframe on a web page, followed by an invisible form, and then have an invisible submission to that form, and then have the plaintiffs hit enter button, unbeknownst to them, in their communication. But this very cookie, where there is a different default setting on browsers, is being put on millions of people's computers regularly, right? Well, to the extent it is placed on browsers that do not have that default setting, they do not have to jump through this hacking scheme in order to get the cookie to track, where there is a web browser that is configured not to block it. That may go to the consent, but I think Judge Fuente's question is going back to a different issue, which is really, what is it that you are alleging is being transmitted here? Because if the only thing you are pointing to is that the cookie is now providing identifying information for that browser, some unique identifier to accompany the substantive communication, and let's assume it's that for a moment, that is otherwise being transmitted in the ordinary course, then aren't we left with record information? No, Your Honors, and the reason why is it's a difference in kind and not a difference in degree. It is then connected. There is the value in that, and Your Honors, I can try to jump back to this, and this goes to the original standing question on intrusion upon seclusion, which is a common law tort which has existed for a century. The Supreme Court in Doe v. Chau explained that for these common law privacy torts, they provide for general damages which are presumed. The Supreme Court didn't just come up with that. It got it from a century of case law. Let's focus on the Wiretap Act, and so the communication that you are asking us to look at here as creating liability under the Wiretap Act, what is that communication? The interception includes the URL, it includes the cookie ID, and it includes their browser, a browser fingerprint, and it includes other information, but it is the totality of that information which makes it a wiretap. You know what, I wanted to pursue that also. I wonder if a cookie, is it something that's going to work like behavioral sort of monitor, in other words, it's going to send somewhere my history, my browsing history, perhaps a number of URLs, etc. What does it do? Or is it just sends information about where I'm clicking on the computer? Well, it's part of the process of compiling just what you're talking about, and this summer in Riley v. California, the Supreme Court held unanimously that that type of data is protected by the Fourth Amendment. Do you know if it does that, or is that just a theory for your case? I mean, do you know that it compiles a history of where I've been on the computer? Does it know more about me than I want it to know? It's included in the, I believe it's included within the plaintiff's petition, and that's the way these defendant's business models work, is to track all of the different places you're going on the internet, and to track your search and browsing history. Let me make sure I understand, obviously you're here because the district court granted the motion to dismiss, and you want us to decide something different than that, but what do you want us to do? What do you want us to do? Tell us, tell us, you really didn't answer fully the standing question. How do you get standing under the California, under the CEPA? Well, under the California Water Type Act, yes, it's a statutory standing, your honors, and again, that's an issue we prevailed on in the district court, not properly on appeal, but it's also an issue in which this district has, this circuit has found statutory standing exists where a plaintiff has adequately alleged all of the elements of a statutory standing, a statutory claim. Let's suppose we didn't conclude that you had any standing under the federal statutes, can we find that you have standing statutorily under the state statutes? Yes, you can. When, let me finish my question, when in effect, that would be allowing the states to statutorily provide standing under Article 3? Yes, you can, your honors, and I think you can, the right rule on the intrusion upon a statutory claim is that the plaintiff is statutorily alleged standing because there is a violation of their rights to privacy, which was highly offensive and a serious invasion of privacy, as evidenced by the fact that Congress in every single state has made this activity illegal, as evidenced by the largest fine in the history of the Federal Trade Commission, as evidenced by the largest multi-state privacy settlement that peaked the ire of nearly 40 separate state attorneys general, and as evidenced by the wiretap claim that we've stated that in California and every other state has held that that gives rise to the tort of intrusion upon seclusion or invasion of privacy, and even if this Court would hold, which we disagree with, that there's no wiretap claim, at the very least, the defendants have violated the Pen Register Act, which is another federal statute protecting privacy and for which there are criminal penalties. Sorry, did you raise that claim? We've raised it within the context of the intrusion upon seclusion claim alleging... Alleging a violation of the Federal Pen Register statute? No, we've alleged violations of their right to privacy in general, and part of the invasion of that right to privacy comes, we argue, the Wiretap Act, Your Honors, but the defendants argument is essentially that a URL is not protected by the Wiretap Act because it's addressing information, which we fervently disagree with, but if it's addressing information, then they violated the Pen Register Act, which also protects privacy. Why isn't it address information? How is it really any different than subscriber-type information that also reveals the substance of where someone is going, or a 1-800 number that has the name in it of the company? Well, thank you, Ira, and the reason is that URLs which specify web search terms or the names of requested files or articles is different. The example we use in our brief, and we use it for explosive purposes, is the how do I reduce herpes breakouts, but it's not just that URL. If you look at our reply brief, there are a ton of footnotes that we purposely did to illustrate the point that URLs have information in them relating to the substance purport or meaning of communication. The cookie would disclose where I have been. The URL would disclose not only where I've been, but what I looked at. It discloses the information contained within a communication being sent and received. Is that a fair characterization, or is that too simplistic? No, I think a URL that includes search terms in the name of a requested file or article also includes information relating back to an electronic communication. So in the herpes example, the plaintiff receives a 1,500-word essay on precisely the topic they were seeking, how to reduce herpes breakouts. I think it offends common sense to suggest that that information has no substance purport or meaning. But what's being sent, what we're talking about is the URL, that is, the particular address on the web of that document, right? So it's not the content of the document at issue. The transmission that we're talking about is just the address of the document. Why isn't that akin to the physical address, knowing someone, for example, is calling this number and you have the subscriber information that shows that it's a herpes clinic? How is it really different? It's more than that, Your Honor, because if you look at the definition of content, it is as broad as possible. It's any information relating to the substance, purport, or meaning of electronic communication. And the defendant's argument in this case is that if it's addressing information, it therefore can't be content, that they're mutually exclusive. But in a national security context, the FISA court rejected that interpretation. And if you look at this broad definition of content, that phrase relates to the underlying substance, purport, or meaning of both what the plaintiff sent off that they are seeking and what they received back from the website, which is that 1,500-word essay, on precisely the topic they were seeking information upon. I'm failing to follow. Just the same point. Why isn't it simply disclosing the addresses that I have been at as opposed to the content of the articles, for example, or newspapers that I have visited? We haven't said, for example, that just because you can tie that telephone number to the herpes clinic, that suddenly it becomes content. It's still record subscriber-type information. Well, to use your telephone example, there's case law that we cite in our opening brief to suggest, not to suggest, to say that post cut-through dialed digits contain content. So that's Brown v. Waddell and the United States Telecom Association v. FCC. And the URL operates the phrase after the hubpages.com would be the equivalent of the address. The phrase after that is the equivalent of the post cut-through dialed digits, how to reduce herpes breakouts. Or to give you another example, consider emails. The hubpages.com is the equivalent of a to or from on the email, and the how to reduce herpes breakouts is the equivalent of the subject line. And the subject line is protected under the Wiretap Act. Just like the very subject, the information that relates to the underlying communication both being sent and received here is protected by the Wiretap Act. Let me get you back and extend your time on rebuttal. Okay. Just to get over to the other side. Okay. Thank you, Your Honor. Mr. Rubin. Good morning, Your Honors. May it please the Court, Michael Rubin for Defendant Google. I'm also presenting argument for the other appellees. You've heard a fair amount this morning. Right. But as the panel noted, we didn't hear anything. In fact, we may have heard an admission that there was no allegation in the consolidated complaint that identified any injury in fact. Why is it a fair inference from the complaint that given that there is a market, even a burgeoning one, for this kind of information, and that the information was taken from them, that its value is now diminished? It's diluted in the marketplace. Why can't we infer that? Well, let me start with three reasons. First, I don't think it's fair to infer the fact that would provide for standing for the Court. Second, the markets, such as they are that the plaintiffs refer to, don't address the type of information that is actually subject to this case. And I would take issue with the use of the word taken. The information, I think this was subject to a lot of the questions that were directed to the plaintiffs' counsel. The information that's at issue in this case flows to the defendants in this case without regard to any cookies. The conduct that the plaintiffs are targeting is the placement of cookies on their browsers. Well, it's what the cookies do, not just the placement. That's actually not what they allege. In paragraph 41 of their complaint, plaintiffs allege that information flows automatically in connection with a publisher's request for an ad, that information flows automatically to the defendants. It includes the URLs. Can I ask you this? Sure. To understand this concept of cookies, how long do they last? How much information can they acquire? Do they have a permanent life? They can, or they can last an hour. Well, who determines that? The company who sets the cookie determines that. You can send the cookie to my computer and have it sit there for years? That can happen. Acquiring browsing information? The cookie doesn't acquire anything. And, in fact, if you look at paragraph 46 of their complaint, they don't allege that the cookie here acquires anything either. What they allege is that the cookie is a static, unique identifier, and that the information that gets transmitted routinely, day in, day out, by everyone in this program's browsers. It is the sender that determines what the cookie should do and look for. The cookie doesn't look for anything. The cookie just sits on the browser and gets sent along with the information that would otherwise be sent. It soaks up data. I'm not sure it soaks up data at all. So let me see if I can give an example really quickly. It soaks up identifiers. It only gets sent along with itself. Maybe it's sort of like a bookmark. Information gets sent anyway, every day, all the time, and then a cookie is placed, and thereafter the same information is sent except that the cookie is there too. It's unique. It's not personally identifying. It has nothing to do with the actual information that's being sent at that time. In fact, if it did, it wouldn't be useful. But it identifies that material being sent as associated with the same browser. That is coming from one instance of that browser. Exactly right. So you're asking us to sort of parse out those different components of what's being sent. But under the Wiretap Act, isn't the paradigm that we're supposed to work with and what the statute provides is do we have an electronic communication defined extremely broadly? And if we do, and if that is intercepted, if it is acquired, then we can look at the carve-outs, which carve out 99% of all communications,  but the default of the statute is that any communication that contains content is going to be covered. Why aren't we looking here at a communication that includes a URL with the identifying information? Is that a fair way to look at one of these communications as we sort of walk through an example of how this might work? I think that's exactly what the court needs to do here, and I think that's exactly what the district court was called upon to do. If that's the case. I think it's challenging to do that here, because the plaintiffs haven't alleged any actual URLs that were visited. So the court can't actually look at any individual URL. But let me suggest that I don't think the court ever gets there here, because the plaintiffs alleged in paragraph 41 that the URL flows, and they concede at page 32 of their opposition brief that this information flows to defendants. The URL goes without the presence of a cookie. And that means that a couple of other elements of the Wiretap Act automatically aren't met. It's not that every communication is covered by the Wiretap Act. It's only those that involve the acquisition of contents through the use of a device. Here, the contents that they identified in their brief was the URL. So they admit in their brief that goes anyway, and the device that they identified in their complaint on an inference reading of it is the cookie itself. We'll come back to the devices, but I just want to follow through on the communication that we're looking at, because if the paradigm is we've got a single communication here that includes the URL and now includes the browser identifier information of the cookie, then aren't we really looking at the question of consent? Your argument is essentially the URL is sent anyway, so there's consent to that. But if what we're talking about is the default of a single communication that has this combined information to that that has the identifier, there has not been consent. And doesn't the Pharmatrax case say that we can look at the scope of consent? The fact that they consented to 75 percent of the information coming through but didn't consent to part of it means there wasn't consent for that communication to be intercepted. What's wrong with thinking about it in those terms? The error in that approach is that the only additional aspect of what's being sent is a cookie value, and a cookie value doesn't equal content under the Wiretap Act. But the single communication does. I think you do have to look at every part of it. As the Court recognized in talking with Mr. Barnes, everything that's sent in that GET request is transactional information except what you can identify as content information, right? That would be the URL at best under their allegation. They're not alleging that everything else is in there. The plaintiffs didn't plead that the cookie is contents. They haven't alleged it. They didn't argue it below, and they haven't argued it here. And there's no way a cookie could constitute contents. Contents has to, by the statutory meaning, relate to the substance, purport, or meaning of the contents at issue. If we're talking about a single combined communication that, let's assume for the moment, has content, we can talk about URLs in a second, but assume it has content, then how is there consent just because part of that is sent anyway? It's a single communication containing content. If one goes under that paradigm, which, as I've explained, we don't think is the right approach to analyzing it. But if you go under that approach, the consent comes from the interaction of the browser and the interaction with the publishers, right? This is a one-party consent statute. And the publishers are directing the browsers. The publishers understand there are cookies involved. That's the nature of this relationship. And they are directing the browsers to connect and send this information on. So there is consent all the way through this process in the way the wiretap has always been understood. The DoubleClick case makes this absolutely clear. Are you suggesting we should look at the consent of the initial web page, not the consent of the user's browser? I think that you should look at both, frankly. I think the user's browser is dispositive of this question. But if you look at the publisher's consent, which is the way the DoubleClick case analyzed this, it resolves the question as well. But the user's browser is the one that has the default setting under Safari and Internet, as alleged, not to allow for this type of transmission to take place. Well, that's actually not how they allege it. They allege that Apple advertised that the default setting didn't allow the placement of cookies. But they further allege in paragraph 46 of their complaint, sorry, at 76 of their complaint, that there are exceptions to that. What about the California Invasion of Privacy Act? It requires two-party consent. So you could prevail on the fact that there's one-party consent that exists under the Wiretap Act. But under the California Act, clearly you don't have consent from the person whose URL is being communicated. Under the proper analysis of parsing out the individual parts of the communication to see what the element of the communication is potentially content, we do. And the California Invasion of Privacy Act only looks at all parties if it's an outside third party analyzing it and accessing the communication. That's not what happened here. That's not what alleged to have happened here. Who are the two parties? The two parties here for the purposes of the California Act would be the user's browser and in this case, because that claim is only brought against Google, would be Google. But how can the user's browser consent when the user didn't consent? If we're talking about how the Internet operates? Yes. And how software is developed? Yes. The software was designed by, we're talking about two pieces of software, Apple's Safari browser and Microsoft's Internet Explorer browser. These pieces of software were designed to function as Google, in this case, interacted with that software. Right. There was nothing that Google interacted with the software in this way, but that deviated from how it was designed and pushed into the market. In fact, the Safari software even advertises itself, Apple advertises it as having a cookie that blocks third party cookies. I don't disagree that Apple has said that. I mean, that's accurate. I don't disagree that Apple has said that. When I use my Safari browser on my iPad, it's been purported that third party cookies will be blocked. But what is being alleged here is notwithstanding the blocking on the Safari browser, third party cookies are still being sent and being placed on my browser that's picking up information. Accurate? I mean, fairly accurate to what they allege, right? Yes, and in paragraph 76 of their complaint, they say that Safari's default settings provide an exception to the third party cookie blocking protection. Okay, so if that's accurate, how can you then say that there is consent from the second party that is required under the California Invasion of Privacy Act? Because the only thing that can constitute contents is the URL, and the URL would be sent anyway. So the only thing that changes is the cookie, and the cookie is not implicated by the California version of the Wi-Fi Act. The same way it's not implicated by the federal version of the Wi-Fi Act. I mean, you purposefully tricked the blocker so that you can get around the blocker, so that you can get information. I would take issue with that charge. That speaks to the idea that you need a consent, and you purposefully tricked that blocker to think that the consent was given. Again, that is a rhetorical claim in the complaint. There's a lot of rhetoric in the complaint. That's not what actually happened? Code is used to place cookies all the time, at all times. It is not that one is invisible, one is visible. There's all sorts of various methodologies to place code, depending on the various software settings of the browsers. Companies need to be able to rely on how software is designed in order to be able to interact with them, and how that is placed into the market. Can you talk about how there is even one-party consent with the Wiretap Act? If what we're looking at is the user's browser and Google or the defendants, because we have a separate, it's an independent communication that's going on from the user's browser to Google, right? And along the lines that Judge Fuentes was just asking, the user hasn't agreed to send combined URL and identifier information. Well, under the argument that the plaintiffs have made, they may not have understood there to have been information passing to the defendants even prior to the placement of the cookie. They may not have. So under an analysis that would require consent to look into the mind of the person using the browser at that stage, a Wiretap claim could be brought against any party interacting with a user on the Internet at any point if there were a claim that that person didn't understand how their system was working at a technical level. That's not what the Wiretap looks at. Is a user able to tell Google, I do not consent to your sending me cookies? Absolutely. Absolutely. The user is able to do it in Safari and in Internet Explorer. The allegations here are that the users, the four named plaintiffs, use these pieces of software in their default state. So what you do is you assume consent unless I tell you otherwise. That the systems attempt to set cookies unless the software rejects it. If the users here had gone in and said, in Apple, said never, which is an easy thing to say, or they had gone to Google systems and downloaded what's called the opt-out cookie, which opts you out of all of this, this wouldn't happen. But if you rely on how browsers characterize their software only, the systems on the other end are going to interact with it. And we have four or three particular defendants at issue in this case. But this is how systems across the entire Internet work. And whatever ruling this court issues is going to affect broad swaths of companies and how they interact. And consent is going to have to be peering behind the screen. And claims are going to be able to be brought based on... Why isn't it fair to attribute the default setting that a user has selected their consent, either yay or nay? Why isn't the default setting a proxy for that? Well, here it may be, but the default setting here had an exception. It had an exception in both these browsers that was designed. This was not some freak aspect of the browser. It was designed in. But the allegation is that you evaded the exception. That's the rhetoric that colors the allegation. There may be factual findings that need to be made on that, but that's the nature of the allegation. I take issue with that. I think the allegation is that the defendants in this case used code to set browsers that used that exception. Now, the plaintiffs are trying to make that look worse by using words like trick, no doubt. But if that exception didn't exist in the browser, it hadn't been designed in there, these cookies would never have been set. Can you talk to us about whether, again, thinking about this as sort of combined communication, are URLs content? We don't think the court gets to that question here. But if we did? If you did. We don't think that that question is susceptible to a ruling as a matter of law. It's a fact-intensive question. So if we get to that question, then you think that we would need to reverse and remand for fact-finding? Absolutely not. Absolutely not. There was no allegation of URLs here. There's no allegation in the complaint of URLs? If you look through the complaint, there is not a single allegation of any particular URL having been intercepted that would enable the court to make a determination of whether or not that URL constitutes content. But there's multiple allegations that URLs are being transmitted. Sure. And there's a recognition by the plaintiffs in this case that lots of URLs don't constitute content. And the district court recognized, absolutely correct, that all URLs are location identifiers. The question of whether a URL could in some context concern the subject, report, or meaning of the underlying content requires not only having the URL in front of you, but as the court recognized earlier, you would actually need to have the page below. Because you can't just look at the words in the URL and know whether they concern the subject, report, or meaning of the underlying page. There has to be a match. You have to see that to see whether a full wiretap claim has been stated because contents are an essential element. In thinking about the privacy intrusion under the California law, I think about the United States versus Jones and think about a GPS device that's placed on a car and whether that operates much like Google places a cookie on my computer. Because when you put the GPS on a car, you can tell where that car has been and where it's going. The same thing as a cookie. But that's an intrusion under Supreme Court doctrine leading to a privacy invasion. So there's a couple of significant distinctions. Number one, that's a Fourth Amendment case. And in those cases, the individuals were identifiable. Here, everything was anonymous. If you look at actual California law that controls on these questions, the Fogelstrom case, I think, from the California Appellate Court is very instructive. But you're still attaching a device, which is essential. It works like a trespass, attaching a device on my computer just as you attach a GPS device on a car to get further information. Well, there's no trespass claim. And I would quibble with whether a cookie is a device. But I think that the way to look at this is that under California law, under these claims that the plaintiffs have asserted, there has to be more than an allegation that the access to the information, the access to the acquisition of the information was wrongful. The use itself has to be a serious invasion. And online advertising, the harm here, which is of sending, at most, a more relevant ad, that's the sum total of what this case is about, someone getting an ad that's different than the ad they otherwise would have received. That doesn't violate public policy in California. That doesn't violate – it's an egregious violation of social norms. That doesn't rise to the level of violating California public privacy. That's exactly what the Fogelstrom case holds. Compiling anonymous information, even if they're prescription records, has been held in California, in the Albertsons case, not to be a violation of California privacy law. Compiling and disclosing browsing history has been held in the Lowe versus LinkedIn case not to be a violation of California privacy law. This is simply not a case that rises to that level. It doesn't come close. The cases that rise to the level of California privacy violations are directly monitoring student-athletes during drug tests, police disseminating the headless corpse of victims. Is there a point at which it really becomes an intrusion on privacy? Because when I hear that cookies can last indefinitely and can gather information indefinitely, but let's say it's a one-shot thing where I click on a, let's say, yellow pad. That's what I want to buy, and all of a sudden for the next month I get ads from Staples and things like that. But what if I keep getting this information for like six months, a year? Isn't there a point where you say this is really an intrusion on my privacy and this is not what I bargained for when I used my computer? In order for there to be an invasion of privacy in this case, we have to have facts in this case to evaluate that, and we don't. Merely saying invasion of privacy, which is effectively all the plaintiffs have done, doesn't pass the test. They have to allege facts as well, and they haven't alleged any facts. First of all, this concept of invasion of privacy as adequate for standing has been waived. They did not argue this before the district court. This was never waived before the district court. You can't waive standing. This particular argument as a basis for injury in fact was never presented to the district court. You don't disagree that you don't need an economic loss to sustain a privacy invasion claim? I don't disagree with that, but you do need to have been aggrieved. You do need to state facts showing that you were aggrieved. Or a claim under the WIATF Act or CEPA. We don't disagree with that either, but you do need to show that you come within the scope of the statutory protections, which plaintiffs here have not and could not do. Can we go back to content for a moment? Do you acknowledge then that there are URLs, perhaps many URLs, that you would concede constitute content for purposes of the WIATF Act? We acknowledge that there may be URLs that could constitute content. And what about... But I'll say there's been none alleged in this case that the court could even begin to look at to reach that conclusion. Mr. Barnes made reference to forms and search queries. Do forms also contain content? I would need to see the form and look at it. I have no idea. And as a matter of process, whether forms get submitted in the connection with these cookies is not an allegation that can be fairly made based on how the technology operates in any event. So if we get to the point of looking at content then under the WIATF Act or CEPA, wouldn't we need to remand for fact-finding on those issues? No. No. Because, first of all, there's no device at issue here. They have to allege a device was used to do the interception, and cookies don't. The only device they allege under the WIATF Act is the code that set the cookies, and they vaguely point to the cookies themselves. So at best, at best, the cookies, the device, they allege. Paragraph 208 of the complaint talks about the defendant's third-party tracking intercepted the class member's communications while they were in transit from the class member's computing devices to the web browsers of the first-party websites the class member used their browsers to visit. In particular, during the course of populating advertising space on the first-party website the class member intended to visit, the defendants transmitted copies of the communications to their own web servers as part of the third-party tracking. Doesn't that show that there are at least three devices that are under discussion? The user's computers, the first-party web servers, and the defendant's servers? They didn't identify any of those as the alleged devices in the complaint. What they identified as the alleged devices were the cookies. And to be, if I may finish. Yes, please. All of those, that infrastructure is used when the cookies aren't involved as well to deliver the ads. So that can't constitute the infrastructure for a WIATF interception if the only thing that has changed is the cookie, right? Every day, routinely, there are ads shown, day in, day out. If the only thing that changes after the cookie is placed is the presence of the cookie, those other things can't constitute the device for the WIATF claim. The only thing that has changed is the cookie. The only thing that's plausibly a device for the WIATF claim is the cookie. Otherwise, all of that other infrastructure exists and would be subject to an interception claim absent the cookie. And that would, again, bring us back to a place where people can be bringing WIATF claims in all sorts of contexts. We really have to finish up. Thank you, Mr. Rubin. Mr. Barnes? So many notes, I don't know where to begin here. I've heard a lot of questions and things about arguments which are not before the court. We appealed the issue on contents. The defendants failed to cross-appeal. All of the talk about devices, they didn't cross-appeal that. They're represented by able counsel. The Supreme Court has held that's a jurisdictional bar to raising it. In addition to that, I heard a bunch of misstatements of fact about what's in the complaint. Page 25 explains how this deceit worked for Apple Safari. Paragraph 126 describes the consent of the websites. And I'll just give you one because I only have a limited time here. We were not aware of this behavior. We would never condone it, said one of the companies whose websites was at issue in this case. But, again, looking to the default setting as a proxy for consent, you were aware of the URLs, the things that you're saying constitute the content, being transmitted in the ordinary course. What's new and different here, if I understand your argument in the complaint, is that there's now identifying information associating that what you're alleging to be content with the browser. It's a difference in kind rather than a difference in degree, Your Honor. It completely transforms the nature of what is taken from the plaintiffs without their consent. And it strains credibility for the defendants who argue this is how the Internet works. We're not talking about consensual cookies. If you look at the actual DoubleClick case that was referenced a few times, the DoubleClick court made some important points. The websites in DoubleClick consented to the tracking. In this case, they didn't. The web browsers in DoubleClick were not configured and did consent to the tracking in DoubleClick. In this case, they didn't. How is this a difference in kind? What is different? If all we're talking about is a difference, is identifier information, and we're in agreement that that alone is record information that's not covered by the Wiretap Act, then why is it a difference in kind to send that separate and apart from something that would have been sent anyway? Well, Judge Fuentes hit directly upon the point. And the question you asked about how long these cookies last, it could be forever. In some cases, two years. The cookies we're talking about here were long-lasting cookies tracking everything you do on the Internet. And because of Google's ubiquity, it's 70% of websites on the Internet. So that's why it's a difference in kind. Is it the case at some point that the addresses become content themselves? Well, the URLs are content where they include search terms, filled out forms, or requested files and articles. Because when they have those three things, they include information relating to the substance, purport, or meaning of communications that clients were sending and receiving from the websites at issue. You asked, in addition, about the Supreme Court case on GPS devices. There's an even more relevant case from this summer in Riley v. California. The Supreme Court unanimously ruled that data held on personal computing devices is protected by the Fourth Amendment. And the Court went out of its way to discuss the importance and the substantive difference, the difference in kind, if you will, between an Internet search and browsing history and other kinds of data. And that, Your Honors, what defendants do, their arguments about being a party to this communication, that turns every computer hacking statute upside down. Because in every single computer hacking case, you're going to have a defendant who figured out how to work their way around the default setting of the electronic communication service. And if the defendants in this case are able to do it, there is no situation where there's a hacking case in which a hacker was unable to get around the default settings. What they argue is essentially, we're smart enough to do this, therefore we shouldn't be liable, we're a party to the communication. But that clearly can't be the case regarding computer hacking statutes. What do we do with the fact that, as Mr. Rubin pointed out, your complaint doesn't seem to allege any specific URL that's visited, any form or content of that form that's transmitted, or particular searches that were conducted by the representative class members? Well, if you look at paragraph, I believe it's 206, Your Honors. We talk about the interception of URLs that the plaintiffs and class members requested from the first party websites. They were visiting. Included within that allegation of URLs is URLs. And some URLs, I heard the defendant talk about some URLs, it seemed almost an admission that some URLs may contain content. But contained within that sentence is including everything within that umbrella of URLs, including search queries, filled in forms, detailed URLs, which include the content articles. Do you agree that other URLs don't include content information? I do not. In the Zynga case, which comes from the Ninth Circuit, the Zynga court followed the same rationale as the FISA case we found and said search queries or similar communications requesting underlined report, but found there wasn't content in some URLs. I think that's a more difficult question, and it's our position that they do include content, but that's not all we're talking about here. Of course, we're talking about URLs that include the article names and files requested in the Hookers example or plenty of examples we've cited in our footnotes, Your Honors. Can you address on the privacy point, Mr. Rubin pointed out correctly that California cases have taken a pretty strict approach when it comes to what is a privacy violation, if it is highly offensive, if it is a serious invasion. So how do you address those cases, and why does this, when we're talking about information that is widely disseminated, including the pairing of the identifier and URL information for all those folks who have a different default setting on their browser, when that's as common as it is, how do you get over that threshold? Those are much different fact patterns. Fogelstrom involved zip codes. One of the other cases he referenced involved, consented to interceptions that then later, the plaintiffs alleged could have been through reverse engineering correlated with them. As for whether it's highly offensive or a serious invasion of privacy, California law is that if you allege a wiretap claim, you radically stated a claim under the common law for these items. That's the law as well in every other state of which we are aware. In addition to that, Your Honor, look at what happened. The Federal Trade Commission levied the largest fine in its history because of this behavior. Nearly 40 different state attorneys general took action. I think those actions show how it's highly offensive and a serious invasion of privacy. Where the California courts have held that loss of things like social security numbers and credit card numbers and prescription information, names and addresses, those don't cross the line into a serious privacy invasion. Why would a URL visited with anonymous identifier type information? We would dispute whether it's anonymous or not. I think that's outside the realm of the complaint. In addition to that, look at the underlying conduct and how this was carried out. The chart on page 25 explains it. I believe it's the paragraph before that where Google said, if you had done something else, if you had gone to their website and clicked on a certain button, you could have blocked this. When this happened, Google had a webpage up that told the public, oh, you don't need to take that step because we respect your privacy preferences on Safari. We won't violate those privacy preferences. I believe that's on page 24. That's fraudulent. I am afraid that we're going to have to finish up. Thank you, Your Honor. Last point. Thank you very much. May I ask counsel to arrange to get a transcript of the hearing today to speak to the court? Please, you can share expenses however you wish to do it. Thank you very much. Thanks, everyone.